**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


MHC FINANCING LTD PARTNERSHIP,          No    C 00-3785 VRW
et al,
                                              ORDER
          Plaintiffs,

          v

CITY OF SAN RAFAEL, et al,

          Defendants.
_____/


          MHC Financing Limited Partnership and Grapeland Vista

(collectively "MHC") together own the Contempo Marin mobilehome

park, located in the City of San Rafael.  MHC initiated this suit

on October 13, 2000, alleging the City's rent and vacancy control

ordinance (Mobilehome Rent Control Ordinance — San Rafael Municipal

Code, Title 20), which affects the Contempo Marin park, violates

the takings clause of the Fifth Amendment.  Doc #1.

//

//

In particular, MHC asserted that the ordinance did not "substantially advance" a legitimate state interest.  Id.  In July 2001, the parties entered a settlement agreement, under which the City agreed to "initiate" amendments to the ordinance that, inter alia, would eliminate vacancy control.  Doc #23, Ex 1, § 2.  In return, MHC would agree to drop the present suit and not challenge the constitutionality of the amended ordinance.  Id.  After encountering strong political opposition, the City declined to eliminate vacancy control.

MHC then amended its complaint to allege, inter alia, that the City had breached the settlement agreement.  Doc #78.  In November 2002, a jury ruled in favor of the City on these claims (Doc #350), and the court has since declined to disturb that verdict (Doc #468).

The court also tried MHC's other claims at the November 2002, trial but delayed its findings of fact and conclusions of law pending the Supreme Court's decision in Lingle v Chevron USA, Inc, 125 S Ct 2074 (2005).  Doc #412.  Lingle eviscerated the "substantially advances" theory on which MHC's takings claims rested.  Lingle, 12 S Ct at 2074.  Accordingly, after Lingle was decided, defendant-intervenor Contempo Marin Homeowners Association ("the Association") renewed its motion to dismiss the remaining claims (Doc #446), and MHC moved to amend its complaint (Doc #450).  On January 27, 2006, the court dismissed certain declaratory relief claims while permitting MHC to amend its complaint to allege other theories by which the ordinance violates the Fifth Amendment, and to add a Fourteenth Amendment substantive due process claim.  Doc #468.

United States District Court

For the Northern District of California

In the present second amended complaint (SAC, Doc #472), MHC alleges the ordinance is an unlawful taking and that it violates substantive due process.  MHC proffers four different theories for its takings claim, alleging that the City has performed:

> (a) a regulatory taking under Penn Central Transportation Co v New York City, 438 US 104 (1978);

> (b) a physical taking under Loretto v Teleprompter Manhattan CATV Corp, 458 US 419 (1982) and Yee v City of Escondido, 503 US 519 (1992);

> (c) a private taking under Kelo v City of New London, 125 S Ct 2655 (2005) and Armendariz v Penman, 75 F3d 1311 (9th Cir 1996) and

> (d) a land-use exaction under Nollan v California Coastal Commission, 483 US 825 (1987) and Dolan v City of Tigard, 512 US 374 (1994).

SAC.  Based on the SAC and the City's opposition, it appears that MHC is asserting each of these takings theories both facially and as-applied.

After MHC filed the SAC, the City moved to dismiss, or in the alternative, moved for summary judgment.  Doc #475.  The City's motion asserts the following grounds:  (1) the takings claims are barred by res judicata; (2) the takings claims are time-barred by the statute of limitations; (3) the takings claims are not ripe pursuant to Williamson County Regional Planning Commission v Hamilton Bank, 473 US 172, 195 (1985); (4) the substantive due process claim fails as a matter of law and (5) MHC's Penn Central, physical takings, private takings and exaction theories are

3

baseless.  Doc #475.  For reasons discussed below, the court GRANTS the City's motion for summary judgment on MHC's physical takings and exaction claims and DENIES summary judgment on all other claims.

I

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.  Calderone v United States, 799 F2d 254, 258-59 (6th Cir 1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists.  TW Elec Serv v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir

4

United States District Court

For the Northern District of California

1987).   The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor."   Anderson, 477 US at 255.   "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id at 249.

## II

As a preliminary matter, the court confronts MHC's argument that the City waived its statute of limitations and res judicata defenses.   Doc #479 at 7.   In a March 19, 2002, order, the court determined that the City had breached the settlement agreement and as a remedy, deemed the City's statute of limitations and res judicata defenses to be waived.   Doc #56 at 13.   But after the City moved to reconsider that decision, the court subsequently determined that the agreement was ambiguous and that its interpretation was an issue for further litigation.   Doc #99.   As noted earlier, MHC then amended its complaint to allege that the City had breached the settlement agreement.   Doc #78.   In November 2002, a jury ruled in favor of the City on these claims (Doc #350), and in its January 27, 2006, order, the court declined to revisit the jury's verdict (Doc #468).   Because the reasons why the statute of limitations and res judicata defenses were deemed waived no longer apply, the court concludes that the City is free to raise those defenses here.

//

//

//

United States District Court

For the Northern District of California

A

The court first addresses the three procedural defects asserted by the City, starting with the City's argument that MHC's takings claims are barred by res judicata.

After the City enacted the 1993 amendments, MHC's predecessor-in-interest, De Anza Assets, Inc, filed an action in California state court challenging the ordinance. De Anza Assets, Inc v City of San Rafael, Case No A063017. De Anza alleged that the ordinance as a whole, which included vacancy control, was a regulatory taking. Doc #475 at 6. The state court sustained a demurrer to De Anza's complaint, and on October 6, 1994, the court of appeal upheld the facial constitutionality of the ordinance. Doc #476, Ex 5 at 1415. The court remanded one portion of the case regarding whether De Anza detrimentally relied on the City's procedures under Palcio De Anza v Palm Springs Rent Review Com, 209 CalApp3d 116, 120 (1989) (providing that where a local rent control ordinance sets forth "a specific procedure for establishing rent increases and a landlord relies on those procedures, those enactments create a property right which becomes vested."). This portion of the case was eventually dismissed for failure to prosecute.

28 USC § 1738 requires federal courts to give the same preclusive effect to state court judgments as they would be given by another court of that state. See San Remo Hotel, LP v City & County of San Francisco, 545 US 323, 338 (2005). Once there is a final judgment on the merits in an action, res judicata generally precludes a party or their privies from relitigating issues that were or could have been raised in the previous action. Allen v

United States District Court

For the Northern District of California

McCurry, 449 US 90, 94 (1980).  To determine the preclusive effect of a state court judgment federal courts look to state law. Palomar Mobilehome Park Ass'n v City of San Marcos, 989 F3d 362, 364 (9th Cir 1993).

MHC contends that the 1994 state proceedings do not preclude its current takings claims under the doctrine of res judicata because (1) there was no final judgment on the merits in the previous action, (2) MHC is not in privity with the plaintiffs in the 1993 action and (3) the 1999 ordinance gave rise to new facial and as-applied claims.  Doc #479 at 7.  For reasons discussed below, only the third argument proves convincing.

MHC asserts that because the court of appeal partially reversed and remanded the trial court's order dismissing the case, there has been no final judgment on the merits for purposes of res judicata.  Doc #479 at 7.  But this argument misstates the law. Although a decision that is reversed on appeal has no preclusive effect, Ornellas v Oakley, 618 F2d 1351, 1356 (9th Cir 1980), under California law, a judgment may be split into final and non-final portions for purposes of res judicata.  See Moore v Wood, 36 Cal 2d 621, 629 (1945) ("[T]he doctrine of res judicata applies to those portions of a judgment which have become final.").  Here, the trial court determined, and the appellate court affirmed, that De Anza failed to state a claim that the ordinance was unconstitutional. Under California law, this determination is a final judgment for purposes of res judicata.

MHC also argues that because it did not participate in the 1993 action, it cannot be considered a privy for purposes of res judicata.  Doc #479 at 8.  But this argument relies on an

7

United States District Court

For the Northern District of California

incorrect definition of privity.  Under California law, a privy is
an individual who, after judgment, "has acquired an interest in the
subject matter affected by the judgment through or under one of the
parties, as by inheritance, succession, or purchase." Rice v Crow,
81 Cal App 4th 725, 735 (2000) (citing Bernhard v Bank of America
Nat Trust & Savings Ass'n, 19 Cal 2d 807, 811 (1942).  Here, MHC
acquired the mobilehome park from its prior owners in 1994.  See
MVL Decl 6(b) 66:26-67:8.  Accordingly, as a purchaser of the
property affected by the judgment, MHC is a privy to De Anza under
California res judicata law.

MHC next argues that the 1999 ordinance created new
injuries and new claims that could not have been raised in the 1993
action.  Doc #479 at 8.  Specifically, MHC contends that "[a] new
as-applied claim also accrues each time a home is sold and MHC is
denied market rent, as well as each year when the City enforces the
law * * *."  Id.  But the Ninth Circuit has expressly rejected this
argument.  In De Anza Properties X, Ltd v County of Santa Cruz, 936
F2d 1084 (9th Cir 1991), the court held that an action challenging
a mobilehome rent control ordinance accrued when the ordinance was
enacted and did not accrue anew "each time one of the appellants'
tenants sells a mobilehome to a new tenant and appellants are
precluded from raising the rent."  Id at 1087.  The court reasoned
that the "action of the local government giving rise to a cause of
action for a taking was the government's enactment of the ordinance
itself" and not the later sale of a mobilehome from one private
party to another.  Id.

Finally, MHC argues that a new facial claim accrued upon
enactment of the 1999 amendment, citing Levald, Inc v City of Palm

United States District Court

For the Northern District of California

_Desert_, 998 F2d 680, 687 (1993) for the proposition that a facial claim accrues upon enactment.  Doc #479 at 8.  MHC notes that the doctrine of res judicata only bars a cause of action where there is an identity of claims between the prior and present actions.  Id.  MHC asserts that because its claims under the 1999 ordinance do not arise from the "same nucleus of operative facts," MHC's present claim is not the same as was previously adjudicated and res judicata does not bar the instant action.  Id.  Although the City also uses the "common nucleus" test in analyzing whether the claims at issue constitute the same cause of action as those previously litigated in the state court proceedings, it is evident to the court that both parties are applying the wrong test.

California law differs from both federal law and that of a majority of states in that its "same cause of action" aspect of the res judicata doctrine is based not on a transactional analysis but upon a primary rights theory.  _Manufactured Home Communites, Inc v City of San Jose_, 420 F3d 1022, 1031 (9th Cir 2005).  Under the primary rights theory, a cause of action consists of (1) a primary right possessed by the plaintiff, (2) a corresponding primary duty on the defendant and (3) a wrongful act done by the defendant constituting a breach of that duty.  _Agarwal v Johnson_, 25 Cal 3d 932, 954-55 (1979).  The primary right is the plaintiff's right to be free of the injury suffered.  _Alpha Mechanical, Heating & Air Conditioning, Inc, v Traveler Cas & Sur Cor of America_, 133 Cal App 4th 1319, 1327 (2005).  This right is distinguished from both the theory of liability on which the injury is premised and the remedy sought.  If an action involves "the same injury to the plaintiff and the same wrong by the defendant then the same primary

9

right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery." <u>Eichman v Fotomat Corp</u>, 147 Cal App 3d 1170, 1174 (1983); see also <u>Mycogen Corp v Monsanto Co</u>, 28 Cal 4th 888, 897 (2002) (concluding that different theories of recovery are not separate primary rights); <u>Slater v Blackwood</u>, 15 Cal 3d 791, 795 (1975) (even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief).

The City argues that <u>MHC v City of San Jose</u> compels preclusion in the instant action. Doc #479 at 8. In <u>City of San Jose</u>, the Ninth Circuit concluded that res judicata barred plaintiffs' second suit challenging a rent control ordinance because both cases involved a single primary right, namely, "the right [for plaintiffs] to receive a fair return on its investment at [its mobilehome park]." 420 F3d at 1031. The lone material difference between MHC's instant action and the suit in <u>City of San Jose</u> is that the present suit attacks an amended ordinance. Accordingly, the essential issue is whether the amendment created a new injury so that the current suit implicates a different primary right from the one involved in the 1994 action.

The rent control ordinance at issue was initially enacted in 1989 and the City amended the ordinance in 1993 to include vacancy control. Like the original ordinance, the 1993 amended ordinance set annual automatic rent increases on a graduated percentage of the consumer price index: 100% of CPI where CPI was 5% or less, 75% of CPI (but no less than 5%) where CPI was between 5 and 10% and 66% of CPI where CPI exceeded 10%. Doc #476, Ex 2.

United States District Court

For the Northern District of California

In 1999, the City modified this automatic increase, changing from a sliding scale to a flat 75% of CPI.  Id, Ex 3.

This amendment severs preclusion under res judicata because it substantively changed the ordinance, and these changes bear on MHC's underlying claims.  Namely, by imposing a flat 75% CPI adjustment, the 1999 amendment allegedly compels an exponentially expanding gap between permitted rental income and fair market rent for the land.  The 1999 ordinance also prevents MHC from including capital improvements in the amount of the base rent.  As a result, even if MHC must invest capital to improve and maintain the park, the ordinance prohibits MHC from gaining a return on such investment.  Hence, the present action does not implicate the same primary right as that in the De Anza proceedings; rather, it involves a different injury to MHC and a different wrong by the City.  Further, these differences affect MHC's takings and substantive due process claims.  Accordingly, the court declines to preclude MHC's claims on grounds of res judicata.

B

The court turns to the City's contention that MHC's takings claims are time-barred.

The applicable statute of limitations in this case is one year (for § 1983 suits in California).  The City asserts that MHC's suit is time-barred because vacancy control was added in the 1993 amendments.  Doc #475 at 12.  MHC argues, as it did for res judicata purposes, that new as-applied claims accrued upon the sale of each home and annual enforcement of the ordinance, and a new facial cause of action arose when the 1999 ordinance was enacted.

Doc #479 at 9.

The City cites <u>De Anza Properties X, Ltd v County of Santa Cruz</u>, 936 F2d 1084, 1086-87 (9th Cir 1991), in support of its contention that MHC's claims are time-barred.  In <u>De Anza</u>, the plaintiffs attempted to circumvent the statute of limitations bar by arguing their cause of action did not accrue until the county amended the ordinance to remove the sunset provision contained in the original ordinance.  Id at 1086.  The Ninth Circuit rejected this argument, finding that "the reenactment of the rent control ordinance * * * did not substantively change its impact upon [plaintiffs]."  Id at 1086.  The court reasoned that because the change "related to duration," it only "affect[ed] damages," not the underlying claim.  Id.

The City's reliance on <u>De Anza</u> is misplaced.  Unlike the amended ordinance in <u>De Anza</u>, which merely extended the time on an existing ordinance, the 1999 amendment substantively changed the law, adding statutory elements and inflicting new economic injuries.  The court <u>De Anza</u> emphasized this very distinction:  it rejected accrual of new claims because "the effect of the ordinance upon plaintiffs has not altered."  936 F2d at 1086.  Without <u>De Anza</u>'s limitation, the City could sequentially amend its ordinance, eventually reducing the CPI adjustment to zero, and each ordinance would be insulated from judicial review by the statute of limitations.  Hence, for purposes of the statute of limitations, when a statute is substantively amended, as here, constitutional attack need only comply with the date of amendment, not the original date of enactment.  Accordingly, MHC's takings claims are not time-barred.

United States District Court

For the Northern District of California

C

The City's final asserted procedural defect is that MHC's takings claims are not ripe.

The ripeness inquiry in the regulatory takings context turns on two considerations:  (1) whether plaintiff obtained a final decision from the governmental authority charged with implementing the regulations and (2) whether plaintiff pursued compensation through state remedies unless doing so would be futile.  See Williamson County v Hamilton Bank, 473 US 172, 194-95 (1982).

Before analyzing the two-prong test of Williamson County, the court notes that the first prong only applies to MHC's as-applied claims; the facial claims do not require a final decision because, by definition, they "derive from the ordinance's enactment, not any implementing action on the part of governmental authorities."  Ventura Mobilehome Communities v City of San Buenaventura, 371 F3d 1046, 1052 (9th Cir 2004).  The state remedies prong, however, applies to MHC's facial and as-applied takings claims.

MHC asserts its as-applied takings claims satisfy the first Williamson prong on three grounds:  (1) no further City action is necessary to ascertain how the ordinance affects MHC's property; (2) the City made a decision to deny MHC discretionary rent increases; and (3) the City declined to vary the ordinance pursuant to the settlement agreement.

In response, the City asserts that MHC has not sought a final adjudication from the City Council because it has never requested a discretionary rent increase since the 1999 amendment.

13

United States District Court

For the Northern District of California

See <u>MHC v San Jose</u>, 420 F3d at 1036 (MHC's challenge to homeowner exemption is not ripe where MHC did not follow administrative process); <u>Ventura Mobilehome Communities Owners Ass'n</u>, 371 F3d at 1053 (as-applied challenge not ripe where parkowner did not allege a request for additional rent increase under the challenged ordinance).

        According to MHC, the first <u>Williamson</u> prong does not require it to file for a discretionary rent increase; rather, all that is required is that a landowner provide the City "the opportunity to grant any variances or waivers allowed by law." <u>Carson Harbor Villages, Ltd v City of Carson</u>, 353 F3d 824, 826-27 (9th Cir 2004).  MHC's argument would not suffice but for the peculiar facts in this case.  Unlike the several cases cited by both parties concerning the ripeness of challenges to mobilehome rent control ordinances, here the parties entered into a settlement agreement, under which the City agreed to "initiate" amendments to the ordinance that, inter alia, would eliminate vacancy control. Doc #23, Ex 1, § 2.  In return, MHC would agree to drop the present suit and not challenge the constitutionality of the amended ordinance.  Id.  This settlement triggered strong political opposition, to which the City acquiesced.  As a result, the City formally declined to eliminate vacancy control.  Through this exchange, MHC obtained a final decision from the City notwithstanding MHC's failure to request a discretionary rent increase after 1999.

        Moreover, while a landowner must give a land-use authority an opportunity to exercise its discretion, "once it becomes clear that * * * the permissible uses of the property are

14

United States District Court

For the Northern District of California

known to a reasonable degree of certainty, a takings claim is likely to have ripened."  Palazzolo v Rhode Island, 533 US 606, 620 (2001).  In Palazzolo, because it was clear the state agency would bar construction on the petitioner's wetland, the Court found the case ripe for review despite the petitioner's failure to apply for development of the particular residential subdivision.  Id. Similarly, here, the restrictions imposed by the City's ordinance are sufficiently certain.  The City's conduct throughout the dispute makes plain it intends to continue subjecting MHC to the ordinance, a fact reinforced by City's unwillingness to eliminate vacancy control pursuant to the parties' settlement agreement in 2002.

          Turning to the second prong of Williamson County — whether MHC pursued compensation through state remedies unless doing so would be futile — MHC contends it has alleged sufficient facts for four reasons:  (1) exhaustion is prudential and not jurisdictional; (2) exhaustion does not apply to injunctive or declaratory relief; (3) MHC exhausted state remedies through litigation of state law claims and (4) further exhaustion is futile.

          That exhaustion is prudential rather than jurisdictional is of little consequence as it does not mean the court should exercise its prudential discretion to forego exhaustion here.  See Suitam v Tahoe Regional Planning Agency, 520 US 725 (1997).  And in any event, MHC has not identified — and the court has not found — any cases in which a court declined to apply the Williamson County test due to its prudential character.

//

United States District Court

For the Northern District of California

Second, MHC contends that exhaustion does not apply to its claims for injunctive or declaratory relief.  In response, the City argues that compensation is the only remedy available for a Penn Central or physical taking and, alternatively, that unexhausted claims for injunctive and declaratory relief are not ripe.  Although the City correctly notes that MHC cannot circumvent Williamson County by alleging only injunctive and declaratory relief, see MHC v City of San Jose, 358 F Supp 2d 896 (ND Cal 2003), affd 420 F3d 1022 (9th Cir 2005), its assertion that compensation is the only remedy for a Penn Central or physical taking claim is mistaken, and requires the court's clarification. The City reads Daniel v County of Santa Barbara, 288 F3d 375 (9th Cir 2002), as flatly preventing injunctive relief for regulatory takings.  Doc #482 at 8.  But that case did not sweep so broadly. The case concerned a plaintiff who sought exemption from the Williamson County ripeness test for his injunctive relief claims, as MHC does here.  Hence, the court dismissed the injunctive relief prayer but did so because plaintiff failed to exhaust state remedies not because injunctive relief is never available for a regulatory taking.

The City also points to the text of the Fifth Amendment to advance its contention that injunctive relief is unavailable, noting that the text does not proscribe the taking of property; it proscribes government taking without just compensation.  But the "just compensation" component of the Fifth Amendment does not bar injunctive relief outright; it only bars such relief if the government is willing and able to pay just compensation.  In any event, the court agrees with the City that MHC cannot circumvent

United States District Court

For the Northern District of California

1    <u>Williamson County</u> merely because it seeks injunctive and

2    declaratory relief.

3            Third, MHC claims that it exhausted state remedies via an

4    October 1996 petition to the City for a $18.37 per month capital

5    expense pass through under the terms of the ordinance.  Although

6    MHC subsequently settled this proceeding with the tenants of the

7    park, a later dispute over the terms of the settlement led MHC to

8    counterclaim against the City in state court for inverse

9    condemnation.  MHC's claim for inverse condemnation asserted that

10   MHC was denied "just compensation" through the City's conduct.

11   City's RJR, Ex 9, ¶ 32.  A demurrer was sustained to this claim,

12   which was affirmed on appeal.  Id, Ex 10.  The City points out that

13   MHC's complaint lacked specificity, i e, it did not make any

14   request based on its rate of return, the effect of rent control,

15   the effect of vacancy control or the effect of the CPI adjustment.

16   Doc #475 at 7.  But the failure to explicate each possible theory

17   of compensation does not render MHC's inverse condemnation claim

18   inadequate.  In <u>Ventura</u>, for example, the Ninth Circuit listed

19   various statutory avenues for exhausting available state court

20   remedies, including, as here, a rent adjustment based on capital

21   improvements.  371 F3d at 1053.  Hence, through this state inverse

22   condemnation claim, MHC pursued compensation via state remedies in

23   satisfaction of the second prong of the <u>Williamson County</u> test.

24           In sum, ripeness doctrine does not require a landowner

25   "to submit applications for their own sake"; rather, it imposes

26   obligations because "[a] court cannot determine whether a

27   regulation goes 'too far' unless it knows how far the regulation

28   goes."  <u>Palazzolo</u>, 533 US at 620; <u>MacDonald</u>, 477 US at 348.  Having

17

sued the City under state law in state and federal proceedings over the course of 14 years, MHC has made clear the scope of the City's ordinance.  Accordingly, MHC's takings claims are ripe.

III

MHC's latest complaint includes a substantive due process challenge to the ordinance.  The City contends this claim runs afoul of Ninth Circuit case law preventing substantive due process challenges based on deprivations of property and also fails because mobilehome rent and vacancy control is rational as a matter of law.

MHC's claim principally derives from Justice Kennedy's concurrence in Lingle, which states in part, "[t]his separate writing is to note that today's decision does not foreclose the possibility that a regulation might be so arbitrary or irrational as to violate due process." Lingle, 125 S Ct at 2087 (Kennedy, J, concurring).  The City counters that the majority never reached this issue and that a concurrence of one cannot sub silentio overturn long-standing Ninth Circuit precedent indicating that a deprivation of property cannot be challenged via substantive due process. Armendariz v Penman, 75 F3d 1311 (9th Cir 1996); Ventura, 371 F3d at 1054; see also Crown Point Development v City of Sun Valley, 2006 WL 288392 at *2 (D Idaho Feb 6, 2006) ("this Court applies the current Ninth Circuit law and finds the complaint should be dismissed as the law of this circuit does not allow substantive due process claims * * * when the interest at stake is real property.").

Yet, in addition to Justice Kennedy's concurrence, the majority opinion in Lingle plainly suggests the availability of a

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

substantive due process challenge to a regulatory taking.  See Lingle, 125 S Ct at 2083 ("We conclude that [the substantially advances] formula prescribes an inquiry in the nature of a due process, not a takings test").  See also id (noting that "probing the regulation's underlying validity" is "logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose").

More significantly, Lingle undercuts the Ninth Circuit's basis for barring substantive due process challenges to deprivations of property.  The reason for this bar was that claims should rely on the explicit textual sources of constitutional protection, if available, such as the takings clause, rather than "the more generalized notion of substantive due process." Armendariz, 75 F3d at 1324.  But Lingle held that challenges concerning the means-ends relationship of a statute do not implicate the takings clause.  125 S Ct at 2083.  Hence, after Lingle, there is no explicit text for assessing whether a regulation is effective in achieving a legitimate public purpose; only the due process clause remains.  See also Blaesser & Weinstein, Federal Land Use Law & Litigation § 2:11 (noting that, after Lingle, "[i]f a land use regulation furthers no public purpose whatsoever then, although just compensation is no longer available under the Fifth Amendment, the failure of the regulation to substantially advance any legitimate public purpose in violation of due process * * * would give rise to a cause of action for damages under 42 USC § 1983").  Accordingly, the court concludes that after Lingle, Armendariz and its progeny no longer preclude a

United States District Court

For the Northern District of California

substantive due process challenge to deprivations of property.

The City contends that MHC's substantive due process challenge also fails because the ordinance is rational as a matter of law.  The City notes that rent control is pervasive and "legislative determinations about the efficacy of economic legislation <u>cannot</u> be second-guessed by the court."  Doc #475 at 10 (citing <u>Kelo v City of New London</u>, 125 S Ct 2655, 2661 (2005); <u>Lingle</u>, 125 S Ct at 2085).

But the premium the City's ordinance confers to tenants differs in kind from the effects of ordinary apartment rent control.  Apartment tenants typically do not sell the occupancy interest in the apartment to their successors; hence, traditional rent control transfers wealth from landlords to the incumbent tenants *and* all future tenants.  By contrast, the City's ordinance effects a one-time transfer of wealth to the incumbent mobilehome owners, who retain the premium when they sell their mobilehome at supracompetitive prices.  The subsequent mobilehome owner obtains none of the benefits of the City's ordinance.  According to the Supreme Court, this distinction "may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance."  <u>Yee v City of Escondido</u>, 503 US 519, 530 (1991).  Additionally, several Ninth Circuit cases question the propriety of rent control ordinances that effect a premium transfer to incumbent tenants.  See e g, <u>Richardson v City & County of Honolulu</u>, 124 F3d 1150 (9th Cir 1997) ("[The ordinance] regulates the use of the lessors' property interests in a manner that does not substantially further the goal of creating affordable housing" due to "[t]he absence of a

mechanism that prevents lessees from capturing the net present value of the reduced land rent in the form of a premium").

That _Lingle_ has shifted the judicial assessment of effectiveness from takings law to the realm of substantive due process does not erase the significance of repeated judicial skepticism of these premium-transfer rent control ordinances.  To the contrary, the reasoning developed under the now-defunct "substantially advances" formula plainly bears on MHC's due process challenge, as both doctrines, in essence, assess the relationship between the City's means and ends.

Regarding the ordinance here, the City's argument fails to assuage the court's concerns.  Rather than defend the ordinance on its merits, the City simply points out the existence of other mobilehome rent control ordinances, which are said to "establish" the ordinance's rationality, "even if economists disagree."  Doc #475 at 2.  But following others does not ensure a sensible path, especially given the City's adamant effort to shield its ordinance from judicial scrutiny.  The court therefore declines to adopt the City's argument, as to do so would insulate even the most arbitrary law from judicial review for the mere reason that two or more cities were obtuse enough to enact it.  Affordable housing may be a reasonable end.  But the City fails on the present record to persuade that the ordinance's one-time premium transfer as a means of achieving that end cannot be analyzed for its rationality.  Accordingly, the court denies the City's motion for summary judgment on MHC's substantive due process claim.

//

//

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

IV

Finally, the City's summary judgment motion argues that MHC's <u>Penn Central</u>, physical takings, private takings and exaction theories are baseless.  For the following reasons, the court grants the City's motion on MHC's physical takings and exaction claim and denies the City's motion on MCH's <u>Penn Central</u> and private takings claim.

A

MHC argues that the ordinance "goes too far [and should] be recognized as a taking."  <u>Pennsylvania Coal Co  Mahon</u>, 260 US 393, 415 (1922).  In <u>Penn Central v New York City</u>, 438 US 104 (1978), the Court set forth factors for evaluating whether a regulation "goes too far":

> Primary among those factors are "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations."  In addition, the "character of the governmental action" -- for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good" -- may be relevant in discerning whether a taking has occurred.

<u>Lingle</u>, 125 S Ct at 2081-82 (citing <u>Penn Central</u>, 438 US at 124). Courts almost universally describe the ad hoc review mandated by <u>Penn Central</u> as involving a three-factor test, assessing the economic impact, the property owner's reasonable investment-backed expectations and the character of the government action.  Moreover, this test is "informed" by the purpose of the takings clause, which is to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be

22

borne by the public as a whole."  <u>Palazzolo v Rhode Island</u>, 533 US 606, 618 (2001) (quoting <u>Armstrong v United States</u>, 364 US 40, 49 (1960)).

The first <u>Penn Central</u> factor, the ordinance's economic impact on MHC, generally assesses "whether the interference with the * * * property is of such a magnitude that 'there must be an exercise of eminent domain and compensation to sustain [it].'"  438 US at 136 (quoting <u>Pennsylvania Coal</u>, 260 US at 413).  In this inquiry a comparison of the value of affected property before and after a regulatory action is relevant and probably essential; but such a comparison, according to the Supreme Court, is by no means conclusive.  <u>Keystone Bituminous Coal Assn v De Benedictis</u> 480 US 490 (1987).  Moreover, the Supreme Court has measured economic effect in several different ways.  See <u>Hodel v Irving</u>, 481 US 704, 714 (1987) (looking to the market value of the property); <u>Keystone</u>, 480 US at 493-96 (1987) (looking to whether the regulation makes the property owner's business operation "commercially impracticable"); <u>Andrus v Allard</u>, 444 US 51, 66 (1979) (looking to the possibility of other economic uses besides sale, which was prohibited by the challenged regulation).

According to the City, that Contempo Marin is currently worth more than MHC's purchase price is dispositive.  The court disagrees.  As discussed below, within the context of <u>Penn Central</u>'s second factor, the Supreme Court flatly rejected this argument.  Because land prices generally rise, especially in California, the post-enactment transfer of title would effectively foreclose any takings challenge.  It would, as the Supreme Court warned, "put an expiration date on the Takings Clause." <u>Palazzolo</u>,

United States District Court

For the Northern District of California

533 US at 633-36.  Further, MHC proffers sufficient evidence to survive the City's summary judgment motion.  In particular, MHC convincingly asserts that the ordinance's flat 75% CPI adjustment creates an exponentially expanding gap between permitted rental income and fair market rent for the land.  Doc #479 at 17-23.  In any event, this Penn Central factor implicates complicated factual issues inappropriate for the court to resolve on summary judgment.

Next, the court turns to the second regulatory takings factor under Penn Central — the extent to which the challenged regulation interferes with the private property owner's distinct investment-backed expectations.  The Supreme Court has indicated in Ruckelshaus v Monsanto Co that such expectations must be reasonable and that failure to prove this second factor can defeat a takings claim.  467 US 986, 1005-06 (1984).  The City emphasizes that MHC knew about the ordinance prior to purchase and notes "the windfall profit [MHC] would receive from purchasing a rent controlled property at a rent controlled price and then eliminating rent control."  Doc #475 at 23.

Although regulatory notice may be a factor in assessing whether the landowner's distinct investment-backed expectations are reasonable, it is by no means determinative.  In Palazzolo, the Supreme Court rejected a categorical notice rule because it would bestow unlimited power to the states unilaterally to define which property rights would receive constitutional protection.

> Were we to accept the State's [notice] rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable.  A State would be allowed, in effect, to put an expiration date on the Takings Clause.

**United States District Court**

For the Northern District of California

1    Hence, although relevant, notice of the ordinance does

2  not foreclose MHC's <u>Penn Central</u> claim.  Of equal importance is

3  "the nature and extent of permitted development under the

4  regulatory regime vis-a-vis the development sought by the

5  claimant."  <u>Palazzolo</u>, 533 US at 633-36 (O'Connor, J, concurring).

6  This factor presumably depends on whether the owner seeks to engage

7  in a use of land that is comparable to that which has been

8  permitted to neighboring landowners.  Compare <u>Lucas</u>, 505 US at 1031

9  ("The fact that a particular use has been engaged by similarly

10  situated owners ordinarily imports a lack of any common law

11  prohibition").  That is, a landowner has a reasonable expectation

12  to use property in the same manner as similarly situated

13  landowners.  Whether the ordinance interferes with reasonable

14  investment-backed expectations therefore also depends on several

15  unresolved factual issues.

16    The final Penn Central factor — the character of the

17  government action — does not unambiguously weigh in the City's

18  favor either.  The <u>Penn Central</u> court did not define the

19  "character" factor except to mention it may depend on whether the

20  regulation amounts to a physical invasion.  Courts now inquire

21  whether the regulation functions "like" a physical invasion after

22  <u>Loretto v Teleprompter Manhattan CATV Corp</u>, 458 US at 426, in which

23  the Court affirmed that a physical invasion is *always* a taking.

24  This factor also depends on whether the property owner has been

25  "singled out" to bear a public burden, perhaps due to bad faith on

26  the part of the government, or has been called upon to provide a

27  public benefit rather than to avoid injury to other persons.  See <u>E</u>

28  <u>Enters v Apfel</u>, 524 US 498, 537 (1998) (plurality opinion) (finding

that the "character" factor weighed in favor of a taking because
the government had singled out the property to bear the substantial
burden of funding federally-mandated retirement benefits to coal
miners); <u>Del Monte Dunes</u>, 526 US at 722-23 (upholding a jury's
finding of a taking whether the City rejected five successive
development plats, each one reduced to correspond to a new
government concern, for various, inconsistent reasons).

        The City urges the court to resolve this factor in its
favor on the basis that MHC has not been "singled out"; rather, the
ordinance applies to both mobilehome parks in San Rafael.  Doc #475
at 24.  But the court declines to interpret the "singled out" test
so narrowly.  That the City has chosen *two* property owners to bear
the burden of providing allegedly affordable housing does not
prevent this factor from weighing in MHC's favor.  Further, this
evidence fails to demonstrate the City's good faith in dealing with
MHC, especially in light of the City's failure to abide by the
parties' settlement agreement.  Hence, this factor, like the
others, cannot be resolved on the present record.

        In sum, for cases involving partial regulatory takings
like the instant action, courts have "generally eschewed" any set
formula for determining how far is too far, choosing instead to
engage in an "essentially ad hoc factual inquir[y]."  <u>Tahoe-Sierra
Preservation Council, Inc, v Tahoe Regional Planning Agency</u>, 535 US
302, 326 (2002).  Due to the innumerable factual questions entailed
in this inquiry, the court declines to resolve MHC's <u>Penn Central</u>
claim at the summary judgment stage.  Accordingly, the court denies
the City's for summary judgment motion.
//

United States District Court

For the Northern District of California

**B**

MHC also asserts that the City's zoning of Contempo Marin creates a physical taking because the zoning requires MHC to continue using Contempo Marin as a mobilehome park.  Yee v City of Escondido, 503 US 519, 528 (1992) (A physical takings case may "be presented where [a] statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.").

The City argues that a physical takings claim is not appropriate in this context because MHC is not required to submit to the physical occupation of the land.  Doc #475 at 17-181; Yee, 503 US at 527-28 ("The government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land.").

According to MHC, the City's zoning laws mandate physical occupation because they cannot be changed, i e, it would be futile for MHC to attempt to alter them.  In particular, MHC asks the court to "infer from rejection of [the settlement agreement] that the City would reject closure of the park." Doc #479 at 23.  Yet the court already declined to infer futility when it determined that MHC could not seek declaratory relief for a right to change the use of the park.  Doc #468 at 24.  Because MHC had never attempted to change the zoning rules under state law, the court concluded that declaratory relief would force the court to "speculat[e] as to future events." Id.  That reasoning applies here as well.  The court cannot conclude the City's zoning laws require MHC to submit to the physical occupation of its land without speculating whether the City would permit modification

27

United States District Court

For the Northern District of California

under state law.  Should, of course, MHC seek to change the use of the land on which Contempo Marin stands and be refused permission to do so and compensation, a physical taking claim may well be an appropriate remedy.  But that is not the case now before the court. Accordingly, the court grants the City's motion for summary judgment on MHC's physical takings claim.

C

MHC also argues that the ordinance conferred a private benefit on identifiable individuals — namely, the tenants of Contempo Marin at the time the ordinance and its amendments were passed — and thus violated the public use restriction of the Fifth Amendment.  See <u>Kelo v City of New London</u>, 125 US 2655, 2661 ("Nor would [defendant] be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit."); <u>Hawaii Housing Authority v Midkiff</u>, 467 US 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."); <u>Calder v Bull</u>, 3 US 386, 388 (1798) (noting that legislation is invalid if it "takes property from A and gives it to B").  Considering whether government action meets the public use requirement "is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose." <u>Lingle</u>, 125 SCt 2074, 2084.

Under the takings clause of the Fifth Amendment, a state may transfer property from one private party to another if future

**United States District Court**

For the Northern District of California

"use by the public" is the purpose of the taking.  <u>Kelo</u>, 125 S Ct at 2661.  This claim therefore turns on whether the City's ordinance serves a "public purpose" — a concept the Supreme Court has defined broadly.  For example, in <u>Hawaii Housing Authority v Midkiff</u>, 467 US 229 (1984), the Supreme Court upheld a statute whereby fee title was taken from lessors and transferred to lessees in order to break up a land oligopoly.  Id at 241-42.  The Supreme Court unanimously rejected the landowners' arguments that the statute violated the public use requirement of the takings clause, concluding that "[t]he 'public use' requirement * * * is coterminous with the scope of a sovereign's police powers."  Id at 240.

The ordinance's purpose in the present action — providing affordable housing — is a public purpose.  MHC disputes, however, whether the City's ordinance achieves such a purpose.  But under the standards set out in <u>Mitkiff</u> and <u>Kelo</u>, courts defer to legislative judgments of this kind:  the court must accept the public purpose of the ordinance unless the City's findings are "palpably without reasonable foundation."  <u>Midkiff</u>, 467 US at 241.

Despite the deference to a legislature's determination compelled by <u>Kelo</u> and <u>Mitkiff</u>, the Supreme Court maintains that "[a] City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party. * * *  Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit"  <u>Kelo</u>, 125 S Ct at 2661.  In <u>Kelo</u>, the City of New London offered a "carefully considered development plan," which particularly described how the

United States District Court

For the Northern District of California

regulation would "revitalize the local economy by creating
temporary and permanent jobs, generating a significant increase in
tax revenue, encouraging spin-off economic activities and
maximizing public access to the waterfront."  Id at 2663 & n6.
Whereas here, the City proffers no such evidence, thereby inviting
the court's inference that the ordinance simply confers a private
benefit on the incumbent tenants.

Moreover, in his concurrence, Justice Kennedy — the
deciding vote in Kelo — further clarifies that judicial deference
regarding the public use clause has limits:

> A court applying rational-basis review under the *Public Use Clause* should strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits * * * *  A court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has merit.  Kelo, 125 S Ct at 2669.

The trial court in Kelo satisfied Justice Kennedy's
standard through "careful and extensive inquiry into whether, in
fact, the development plan is of primary benefit to the developer *
* * [and] only incidental benefit to the City."  Id.  Such an
inquiry will likewise be necessary in the present action.
Accordingly, the court denies the City's motion for summary
judgment on MHC's private takings claim.

D

MHC also contends that the ordinance constitutes a land-
use exaction under Nollan/Dolan.  See Nollan v California Coastal
Commission, 483 US 825 (1987) (finding a taking when there was no

"essential nexus" between a legitimate state interest and a public
easement exacted for a building permit); <u>Dolan v City of Tigard</u>,
512 US 374, 391 (1994) (finding a taking when a required public
dedication lacks "rough proportionality" to a proposed
development).

This claim fails because the ordinance cannot be
construed as a land-use exaction without upending takings law.  In
<u>City of Monterey v Del Monte Dunes</u>, the Supreme Court restricted
the scope of the <u>Nollan</u>/<u>Dolan</u> rule:  "we have not extended the
rough-proportionality test of <u>Dolan</u> beyond the special context of
exactions — land-use decisions conditioning approval of development
on the dedication of property to public use."  526 US 687, 702
(1999).  MHC argues the ordinance constitutes an exaction on the
theory that it conditions MHC's use of the land subject to
perpetual rent control.  The court rejects this novel theory.
Every land-use regulation subjects the property-owner's use to a
limitation of some kind.  To characterize these regulations as
exactions would flatly undermine <u>Lingle</u>'s rejection of the
"substantially advances" test within takings law, especially
considering <u>Lingle</u> itself concerned a rent-control statute.  MHC
has not sought to develop property in San Rafael; hence, no land-
use exaction has occurred.  See <u>Del Monte Dunes</u>, 526 US at 702
(1999) (defining "exactions" as "land-use decisions conditioning
approval of development on the dedication of property to public
use.").  Accordingly, the City's motion for summary judgment on
MHC's exaction claim is granted.

//

//

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

V

Finally, the City requests the court adjudicate its pending motion to dismiss, or alternatively, for summary judgment in MHC Financing Limited Partnership et al v City of San Rafael et al, C-04-3325 (MHC II), a second suit MHC filed against the City of San Rafael on August 16, 2004.  See Doc #40, C-04-3325.

The court finds that MHC waived the damages it now asserts in MHC II during proceedings in MHC I (C-00-3785) when MHC waived its claims for past and future constitutional damages and proceeded to trial on its constitutional claims seeking only declaratory and injunctive relief.

Absent the waived damages, MHC II (C-04-3325) involves the same subject matter as the claims brought in MHC I (C-00-3785). Because a litigant "has no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant," Barapind v Reno, 72 F Supp 2d 1132, 1145 (ED Cal 1999), the court dismisses MHC II (C-04-3325) with prejudice.


VI

In sum, the court GRANTS the City's motion for summary judgment on MHC's physical taking and exaction claims and DENIES the City's motion for all other claims.  Additionally, the court GRANTS the City's motion to dismiss proceedings in case number 04-3325.

//

//

//

1          The parties are DIRECTED to appear for a pretrial

2    conference on January 9, 2007, at 9:00 am, or such other date as

3    they mutually agree and arrange with the court's courtroom deputy,

4    Cora Delfin, who may be reached at (415) 522-2039.

5

6          IT IS SO ORDERED.

7

8    _____

9          VAUGHN R WALKER

10         United States District Chief Judge

11

12